**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

March 31, 2025

Gregory V. Varallo, Esquire
Andrew E. Blumberg, Esquire
Benjamin M. Potts, Esquire
Bernstein Litowitz Berger &
  Grossmann LLP
500 Delaware Avenue, Suite 901
Wilmington, Delaware 19801

Garrett B. Moritz, Esquire
Adam D. Gold, Esquire
Thomas C. Mandracchia, Esquire
Dylan T. Mockensturm, Esquire
Ross Aronstam & Moritz LLP
1313 North Market Street, Suite 1001
Wilmington, Delaware 19801

RE: *In re Santander Consumer USA Holdings Inc. Stockholders' Litigation*, Consol. C.A. No. 2022-0689-LWW

Dear Counsel:

This action challenged the fairness of a 2022 buyout of a Santander subsidiary's public shares. The case settled on the eve of trial after years of hard-fought litigation led by Elliott—a prominent investment management firm that held a large stake in the subsidiary. I approved both the settlement, which secured $162.5 million for the stockholder class, and a fee award to the plaintiffs' counsel out of that amount. I took Elliott's request for a $1.625 million incentive award under advisement.

Elliott devoted extraordinary time and expertise to building, advancing, and resolving the case, yielding a positive outcome for the class. But the bonus it seeks,

which is 62.5% greater than the largest incentive award granted in Delaware, is excessive. After considering the competing policy interests at play and precedent, I conclude that $500,000 to be paid out of lead counsel's fee award is appropriate.

## I. BACKGROUND[1]

This case concerns a take-private transaction of Santander Consumer USA Holdings, Inc. ("SCUSA"), a consumer auto financing company. In January 2022, global financial institution Banco Santander, S.A. and its United States operating subsidiary Santander Holdings USA, Inc. ("SHUSA") purchased the public shares of SCUSA for $41.50 per share. Before the buyout, SHUSA owned approximately 80% of SCUSA; the remaining 20% was publicly traded.[2]

Elliott, previously SCUSA's largest minority stockholder, proceeded to conduct a books and records investigation before filing a class action complaint.[3] Its suit was consolidated with another brought by a pension fund, and an amended

---

[1] The factual discussion that follows is based on allegations in the Verified Amended Class Action Complaint and the background described in the plaintiffs' settlement brief. *See* Verified Am. Class Action Compl. (Dkt. 141) ("Compl."); Pls.' Opening Br. in Supp. of the Proposed Settlement, Class Certification, Award of Att'ys' Fees & Expenses & Incentive Award (Dkt. 203) ("Settlement Br."). I have not made—and am not making—any findings of fact.

[2] Compl. ¶¶ 1-5.

[3] *See* Dkt 1; Compl. ¶ 53. I refer to co-lead plaintiffs Elliott International L.P. and The Liverpool Limited Partnership together as "Elliott."

complaint was filed.[4] The co-lead plaintiffs challenged the fairness of the buyout, which involved a two-step tender offer (with no minimum tender condition) and merger under 8 *Del. C.* § 251(h).[5] Elliott and its counsel theorized that Santander insiders had unique knowledge that allowed them to time the buyout so that they reaped billions of dollars in unique benefits.[6]

The parties prepared for trial through the summer of 2024. They were "effectively trial ready" when, on September 9, 2024, they accepted a mediator's double-blind proposal to settle for $162.5 million.[7]

After providing notice to the class, the parties appeared at a December 17, 2024 settlement hearing. I approved the settlement as fair and reasonable.[8] I approved lead counsel's request for a fee and expense award of $26,631,143.34 from the settlement fund.[9] I approved Elliott's request for the reimbursement of its expenses totaling $3.8 million—largely consisting of outside expert fees.[10]

---

[4] Dkts. 19, 131, 141.

[5] Compl. ¶ 4.

[6] *Id.* ¶ 10.

[7] Settlement Br. 2, 25-26.

[8] Dkt. 211 ("Settlement Hr'g Tr.") 43; *see also* Dkt. 210 ¶ 10.

[9] Settlement Hr'g Tr. 40, 43.

[10] *Id.* at 41; Settlement Br. 57.

I approved the co-lead plaintiff's request for a $5,000 incentive award.[11]  And I took

Elliott's request for a $1,625,000 incentive award, which amounts to 1% of the

settlement fund, under advisement.[12]

## II.  ANALYSIS

Individual stockholders may bring representative litigation and pursue a

recovery on behalf of a stockholder class.[13]  "At the conclusion of a class action, the

class representatives are eligible for a special payment in recognition of their service

to the class."[14]  This payment—called an "incentive award"—is in addition to the

representative plaintiff's pro rata recovery as a class member.  It is typically paid out

of class counsel's own fee and expense award.[15]

A representative plaintiff takes on risks and burdens not shared with the absent

class members.  To be an "adequate" representative, a plaintiff must maintain

oversight of class counsel and involvement with the case.[16]  She may face intrusive

---

[11] Settlement Hr'g Tr. 43.

[12] *Id.* at 42.

[13] *See* Ct. Ch. R. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members . . . .").

[14] 5 William B. Rubenstein et al., *Newberg and Rubenstein on Class Actions* § 17:1 (6th ed. 2024).

[15] *See Chen v. Howard-Anderson*, 2017 WL 2842185, at \*2 (Del. Ch. June 30, 2017) (ORDER) ("[I]ncentive awards in Delaware are often authorized to be paid out of class counsel's share of the recovery." (citation omitted)).

[16] Ct. Ch. R. 23(a)(4).

discovery such as being deposed, having documents collected from personal devices, or undergoing cross-examination at trial.[17] If the case goes awry, she may risk reputational harm—and even sanctions.

Incentive awards can encourage a plaintiff to step up as representative plaintiffs and compensate them for "shouldering the extra burden in class action litigation."[18] Without an award, the representative plaintiff may bear "certain costs of continued litigation while receiving a disproportionately smaller pro-rata share of the marginal benefit."[19] The incentive award is not only a rescissory measure, but also serves as "an incentive to proceed with costly litigation (especially costly for an actively participating plaintiff) with uncertain outcomes."[20]

---

[17] *See e.g.*, *Voigt v. Metcalf*, C.A. No. 2018-0828-JTL, at 43-46 (Del. Ch. Feb. 2, 2022) (TRANSCRIPT) (describing the extensive and burdensome discovery taken against the plaintiff as a factor in determining the plaintiff's incentive fee award).

[18] *Raider v. Sunderland*, 2006 WL 75310, at *1 (Del. Ch. Jan. 4, 2006); *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) ("The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation and to reward the public service of contributing to the enforcement of mandatory laws." (citation omitted)); Rubenstein, *supra* note 14, § 17:3 (explaining that incentive fees "aim to compensate class representatives for their service to the class and simultaneously serve to incentivize them to perform this function").

[19] *Raider*, 2006 WL 75310, at *1; *see also In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679, 733 (Del. Ch. 2023) ("A representative plaintiff must devote time to the litigation, and if that time has to be offered *gratis*, then the representative plaintiff effectively pays for taking on the role of class representative. Rather than receiving the same amount as the class, the named plaintiff receives less."), *aff'd*, 326 A.3d 686 (Del. 2024).

[20] *Raider*, 2006 WL 75310, at *1.

Despite these worthy goals, incentive awards are not without drawbacks.[21] The promise of a bonus could be used to entice an indifferent stockholder to lend her name and shares to a lawyer-driven lawsuit.[22] An incentive award may create a conflict between the interests of the class and those of the representative plaintiff.[23] It could, for example, tempt a class representative to accept a result unfavorable to the class if an incentive payment is offered.[24] Or, a plaintiff might withhold consent to "an optimal settlement in the hopes of achieving a larger settlement" with a larger incentive fee.[25]

Given these competing interests, Delaware courts scrutinize incentive award requests. The presumption is against any bonus payment to a representative plaintiff

---

[21] *See Isaacson v. Niedermayer*, 200 A.3d 1205, 1205 n.1 (Del. 2018) (TABLE) (recognizing that "incentive fee awards may be problematic" in certain "circumstances").

[22] *See In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1077 (Del. Ch. 2015) (noting that large incentive awards may raise "the specter of . . . an improper lawyer-client entanglement").

[23] *See* Rubenstein, *supra* note 14, § 17:3 ("Incentive awards for class representatives seem problematic because they appear to treat the class representative differently than the other members of the class.").

[24] *See Raider*, 2006 WL 75310, at *1 ("[A] plaintiff's fiduciary obligations to the class could be compromised by the temptation of a quick settlement and a quick bonus payment."); *see also Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989) ("If class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.").

[25] *Raider*, 2006 WL 75310, at *1.

who "did not undertake efforts above the baseline expected of litigants."[26] Nominal incentive awards are occasionally justified by the policy of encouraging class representatives to take on that role.[27] More meaningful—though still modest—payments have been awarded where the representative plaintiff has been subjected

---

[26] *Schumacher v. Loscalzo*, 2023 WL 4842103, at *7 (Del. Ch. July 28, 2023) (declining to grant a request for a $1,500 incentive award (quoting *Raider*, 2006 WL 75310, at *2)); *see also Morrison v. Berry*, 2021 WL 2926138, at *2 (Del. Ch. July 12, 2021) (rejecting a request for a $5,000 incentive award paid from counsel's fee award where the plaintiff's service "was not of the type of those exemplary efforts of past class representatives who did earn a fee"); *In re Fuqua Indus., Inc. S'holder Litig.*, 2006 WL 2640967, at *2 (Del. Ch. Sept. 7, 2006 ("In Delaware, representative plaintiffs typically receive no compensation for their services other than their pro-rata share of the class recovery and their reasonable out-of-pocket costs and expenses.").

[27] *See, e.g.*, *In re AMC Ent. Hldgs., Inc. S'holder Litig.*, 2023 WL 5165606, at *41 (Del. Ch. Aug. 11, 2023) (observing that in "typical baseline circumstances," nominal incentive awards "reward[] competent participation"), *aff'd sub nom. In re AMC Ent. Holdings, Inc.*, 319 A.3d 310 (Del. 2024); *see also In re Galena Biopharma, Inc.*, Consol. C.A. No. 2017-0423-JTL, at 83-84 (Del. Ch. June 14, 2018) (TRANSCRIPT) ("[N]ominal awards are understandable and appropriate, given the current litigation environment in which there's significant downside to serving as a named plaintiff."); *Spritzer v. Aklog*, C.A. No. 2020-0935-KSJM, at 44 (Del. Ch. Nov. 3, 2022) (TRANSCRIPT) (awarding $2,000 and observing that nominal awards incentivize plaintiffs "to put their names on the papers"); *Tylenda v. Calogero*, C.A. No. 2023-1277-NAC, at 52-53 (Del. Ch. Jan. 23, 2025) (TRANSCRIPT) (awarding $1,000 where the plaintiff monitored and communicated with counsel because "signing up to be a representative plaintiff is not costless"); Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1305 (2006) (describing the essential role of the named plaintiff in allowing class actions to be "effectively litigated").

to burdensome discovery.[28] But substantial incentive awards are "rare" and awarded only in "the exceptional case."[29]

In *Raider v. Sunderland*, Chancellor Chandler outlined two factors that guide the Court of Chancery's discretion in assessing whether an incentive award should be granted and the size of any such award.[30] He explained that the court should consider whether the class representative (1) expended "a significant amount of time, effort and expertise" on the case, and (2) obtained "a significant benefit [for] the

---

[28] *See, e.g.*, *Riche v. Pappas*, C.A. No. 2018-0177-JTL, at 26 (Del. Ch. Sept. 16, 2020) (TRANSCRIPT) (approving a $7,500 incentive award where the plaintiff was deposed and involved in an in-person mediation and trial preparations); *Buttonwood Tree Value P'rs, L.P. v. R.L. Polk & Co., Inc.*, C.A. No. 9250-VCG, at 35-36 (Del. Ch. Oct. 14, 2024) (TRANSCRIPT) (approving a request for a $5,000 incentive fee where the plaintiff "faciliat[ed] discovery by providing documents and attending depositions," was involved in a decade-long lawsuit, and "participated" in a mediation session); *In re Warner Bros. Discovery, Inc. S'holder Litig.*, C.A. No. 2022-1114-JTL, at 15 (Del. Ch. Oct. 10, 2024) (TRANSCRIPT) (awarding $5,000 to a named plaintiff who responded to written and document discovery and noting that the award was a "modest offset" to "address what would otherwise be a detriment" to the plaintiff, who "effectively received less than the remainder of the class by providing their services"); *Diep v. Sather*, C.A. No. 12760-CM, at 19-20 (Del. Ch. Sept. 10, 2021) (TRANSCRIPT) (granting a request for a $5,000 incentive fee where the representative plaintiff traveled cross-country for a deposition, losing three days of work).

[29] *Oliver v. Boston Univ.*, 2009 WL 1515607, at *1 (Del. Ch. May 29, 2000); *see also Raider*, 2006 WL 75310, at *1; *In re Pattern Energy Grp. Inc. S'holder Litig.*, C.A. No. 2020-0357-MTZ, at 34 (Del. Ch. May 3, 2024) (TRANSCRIPT) (approving $25,000 incentive awards for two named plaintiffs who were the subjects of extensive discovery including multiple depositions and were closely involved in the case and observing that the awards were "unusual" awards for "unusual facts").

[30] 2006 WL 75310, at *1.

class."[31]   The Delaware Supreme Court has encouraged the Court of Chancery to conduct a "careful review" of these factors "before making incentive fee awards."[32]

An application of the *Raider* factors indicates that Elliott's exceptional work merits an equally exceptional award—albeit one less than Elliott seeks.  Elliott's ask well exceeds that awarded by any Delaware court, and precedent suggests that it is too high.  An incentive award of $500,000 is appropriate.

## A.     Elliott's Contributions to the Class

Elliott contributed "a significant amount of time, effort, and expertise" to the case.[33]  These contributions were essential in securing a meaningful financial benefit for the class.

Elliott estimates that it spent 1,630 hours on this matter over about two and a half years.[34]  Its work at every stage of the case drastically exceeded that typical of a representative plaintiff.  Elliott spearheaded efforts during the pre-complaint investigation, fact and expert discovery, trial preparations, and settlement negotiations.[35]

---

[31] *Id.*

[32] *Isaacson*, 200 A.3d at 1205 n.1 (citing *Raider*, 2006 WL 75310, at *2).

[33] *Raider*, 2006 WL 75310, at *2.

[34] Decl. of Gaurav Toshniwal ¶ 38 (Dkt. 203) ("Toshniwal Decl."); *see* Settlement Br. 2.

[35] Toshniwal Decl. ¶¶ 6-35.

At the outset, Elliott's hundreds of hours of investigatory and valuation work prompted it to contact counsel to pursue a challenge to the buyout.[36] It worked closely with counsel to prepare the original complaint, spending 100 hours on that task alone.[37] It assisted in preparing an amended complaint, a novel spoliation motion, a pre-trial brief, and in setting trial strategy. These pretrial efforts totaled over 240 hours.[38]

Elliott was similarly immersed in offensive and defensive discovery. It invested 380 hours in fact discovery, including 160 hours reviewing and analyzing documents produced to it.[39] It produced over 3,000 documents in response to 27 requests for production and responded to 34 interrogatories.[40] An Elliott portfolio manager prepared and sat for an 11-hour deposition as Rule 30(b)(6) witness.[41] Elliott also invested 320 hours in expert discovery.[42]

---

[36] *Id.* ¶¶ 7, 11-12; *see also id.* ¶ 8 (stating that Elliott's early valuation work took "over 250 hours").

[37] *Id.* ¶¶ 13-14.

[38] *Id.* ¶ 35.

[39] *Id.* ¶¶ 17, 20, 24.

[40] *Id.* ¶ 22.

[41] *Id.* ¶ 23.

[42] *Id.* ¶ 29.

Throughout the matter, Elliott supplied financial and valuation expertise.[43] Its team included multiple technically proficient investment professionals.[44] It remained deeply involved through settlement negotiations, devoting more than 210 hours to resolving the case in a way benefitting the class.[45] Lead counsel confirmed the significance of Elliott's contribution, stating that it "made [their] jobs easier and made the outcome better."[46]

Elliott's time, effort, and expertise generated value for the class. The $162.5 million settlement is the second largest class settlement in Court of Chancery history.[47] It represents a 6.5% premium to the deal price—a significant increase.[48] Elliott's efforts and valuation expertise meaningfully contributed to this result.[49]

---

[43] *Cf. Morrison*, 2021 WL 2926138, at *1 (citing instances where expertise in tax, financial, and trusts supported incentive awards).

[44] Toshniwal Decl. ¶ 4.

[45] *Id*. ¶¶ 36-37.

[46] Settlement Hr'g Tr. 29; *see also Chen*, 2017 WL 2842185, at *4 (considering lead counsel's position on an incentive award request "because the lawyers have worked directly with the named plaintiff and are generally better positioned to evaluate the named plaintiff's contribution" than the court).

[47] This data point was offered by lead counsel. *See* Settlement Br. 1. I have not independently confirmed it.

[48] Settlement Hr'g Tr. 20. Lead counsel represents that 6.5% premium achieved is the largest ever in a Delaware M&A class settlement above $75 million. *Id.*; Settlement Br. 43-44.

[49] *See Raider*, 2006 WL 75310, at *2 (explaining that the court "notably ignore[s] the benefit to the class" in setting an incentive award and looks to the effort and expertise

B.     **Comparison to Precedent**

Generally, representative plaintiffs have limited involvement in a suit.  The "baseline" expectation is that the plaintiff reviews the pleadings she is asked to sign, engages with counsel, and agrees to any settlement.[50]   These efforts do not automatically entitle the plaintiff to a bonus; the starting presumption is the opposite.[51]  If any incentive award is granted, it is a nominal one.[52]

There are outlier cases, however.  On rare occasion, a representative plaintiff will devote extraordinary time and expertise to a case that profoundly contributes to value creation for a stockholder class or nominal defendant.  The Court of Chancery is willing to grant greater incentive awards in those unusual cases.[53]

---

devoted); *see also Chen*, 2017 WL 2842185, at *4; *supra* notes 34-46 and accompanying text (describing Elliott's work on the case).

[50] *Schumacher*, 2023 WL 4842103, at *7 (denying a nominal incentive award where the plaintiff reviewed pleadings, spoke with his counsel, and approved a settlement).

[51] *See Morrison*, 2021 WL 2926138, at *2; *see supra* note 26 and accompanying text.

[52] *See supra* note 27 and accompanying text.

[53] *See Raider*, 2006 WL 75310, at *2; *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2012 WL 1655538, at *8 (Del. Ch. May 9, 2012) (approving awards of $35,000 and $20,000 for plaintiffs who made "substantial contributions to the case"); *Activision Blizzard*, 124 A.3d at 1077 (awarding $50,000 where the lead plaintiff "participated meaningfully in the case" in addition to being subjected to "vigorous attacks" during litigation); *Brinckerhoff v. Texas E. Prods. Pipeline Co.*, 986 A.2d 370, 396 (Del. Ch. Jan. 15, 2010) (awarding a $100,000 fee to the lead plaintiff out of his counsel's award where the plaintiff "spent approximately 1,000 hours assisting on the litigation").

In *Raider*, the court approved a "bonus payment" of $41,000 to the lead plaintiff in recognition of his efforts in support of a $15 million cash recovery for the class.[54] Lead plaintiff Raider dedicated 200 hours to the case—reviewing documents, communicating with class counsel, providing analysis, and negotiating the class settlement.[55] He also supplied unique knowledge as an attorney, accountant, and manager that gave him a "leading role" in the case.[56] Raider's expertise played a particularly critical role in negotiations and settlement discussions, which increased the settlement amount by a third.[57]

A bonus of a similar size was awarded in *Oliver v. Boston University*.[58] There, the lead plaintiff spent 2,000 hours on a class action suit.[59] He "was deposed extensively, attended each day of trial, and . . . interacted extensively with counsel."[60] He also "helped with document review and recognized an important document from a large set of documents produced that played a key role in

---

[54] *Raider,* 2006 WL 75310, at *2.

[55] *Id*.

[56] *Id.*

[57] *Id.*

[58] 2009 WL 1515607, at *1.

[59] *Id.*

[60] *Id.*

supporting the class recovery."[61]  Oliver's expertise as a trust officer furthered the beneficial outcome for the class.[62]  Although Oliver sought an award of $50,000, the court granted him $40,000 as "reasonable compensation for his efforts" toward a classwide recovery of $2,837,454.[63]

An incentive award of greater scale was granted in *In re El Paso Pipeline Partners, LP*.[64]  There, the named plaintiff in a derivative suit sought an incentive award of $1.35 million after the court awarded damages of nearly $171 million.[65] The plaintiff purportedly "discovered the alleged wrongdoing."[66]  He invested 1,500 hours on the matter over a period of five years and ten months.[67]  His "expert knowledge of the MLP industry and highly informed opinions and insight" as a former investment banker "were essential to counsel" at all stages of the case.[68]  The

---

[61] *Id.*

[62] *Id.*

[63] *Id.* at *1-2.

[64] 2016 WL 451320, at *2 (Del. Ch. Feb. 4, 2016) (ORDER), *vacated on other grounds sub nom. El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016).

[65] *See* Pl.'s Br. in Supp. of His Appl. for Att'ys' Fees and Reimbursement of Expenses, *In re El Paso Pipeline P'rs, LP Deriv. Litig.*, C.A. No. 7141-VCL, at 10 n.3, 16 (Del. Ch. Jan. 8, 2016) (Dkt. 251).

[66] *Id.* at 16.

[67] Aff. of Peter Brinckerhoff, *El Paso*, C.A. No. 7141-VCL (Dkt. 253).

[68] *See id.*; Pl.'s Br. in Supp. of His Appl. for Att'ys' Fees and Reimbursement of Expenses, *El Paso*, C.A. No. 7141-VCL, at 16 (Dkt. 251).

court awarded him $450,000—a third of what he sought—out of the plaintiff's counsel's fee award.[69]

An incentive award of $1,000,000—the largest in Delaware—was granted in *Chen v. Howard-Anderson.*[70] The named plaintiff "effectively acted as a second attorney," devoting 4,000 hours to the case. He spent hundreds of hours reviewing documents, attending depositions, researching and preparing memoranda, and actively participating in settlement negotiations.[71] Chen also supplied his expertise as a professional investor to address questions of valuation and assist class counsel.[72] He developed key litigation strategies, including preparing the first draft of a "detailed, high-quality" 130-page amended complaint.[73] His efforts contributed to the $35 million recovery.[74]

Most notably, Chen's involvement led to negative personal consequences. Discovery was used to cast allegations of misconduct against Chen, sanctions were sought against him, and a costly investigation by the Securities and Exchange Commission ensued. Although he eventually received a no action letter from the

---

[69] *El Paso*, 2016 WL 451320, at *2.

[70] 2017 WL 2842185, at *6.

[71] *Id.* at *4.

[72] *Id.*

[73] *Id.* at *5.

[74] *Id.* at *3.

SEC, negative press on the matter effectively ended Chen's career on Wall Street.[75]

Lead Delaware counsel recommended an incentive award of $1,000,000 for Chen; the court adopted that estimate.[76]

This is not an exhaustive study of every noteworthy incentive award in Delaware, but it supplies a rough scale to gauge Elliott's entitlement here.

The time Elliott devoted to this case well exceeds that of the plaintiff in *Raider*, but it is thousands of hours less than those devoted in *Chen*. Its participation is closer to that of the plaintiffs in *Oliver* and *El Paso*. Substantively, Elliott's expertise seemingly played a greater role than that of the plaintiff in *Oliver*; in that respect, it is more like *El Paso* and *Chen* where the plaintiffs were investment professionals (though neither was an institution like Elliott).

Elliott did not, however, incur the sort of personal harm that the plaintiff in *Chen* suffered due to his involvement in the case.[77] The risks Elliott faced are in line

---

[75] *Id.* at *5-6. Risk exposure also justified a $50,000 incentive award in *Dell Technologies*, which the court described as "modest, given the time and effort . . . expended." 300 A.3d at 734. There, the lead plaintiff was subjected to a "scorched earth strategy" of aggressive discovery through which the defendants attempted to turn up evidence of wrongdoing. *Id.* The court found that the discovery demands not only caused the plaintiff pension fund to expend significant time and effort but also subjected it to reputational risk. *Id.*; *cf. Fox v. CDX Hldgs., Inc.*, 2015 WL 5163790, at *1 (Del. Ch. Sep. 02, 2015) (ORDER) (granting an incentive payment of $100,000, "greater than what this court typically authorizes," because the representative plaintiff "risked his employment").

[76] *Chen*, 2016 WL 451320, at *6.

[77] *See supra* note 76 and accompanying text.

with how its core business operates.[78] It incurred opportunity costs by investing the time of its professionals and fronting millions of dollars of expenses. Doing so paid off. As the largest minority stockholder in SCUSA, it recovered almost one-third of the settlement fund and its expenses were repaid in full.[79]

These facts indicate that an incentive award at the top of the scale—the $1 million granted in *Chen*—is unwarranted. A bonus like those in *Raider* or *Oliver*, though, is not enough in view of Elliott's major contributions to an excellent result. *El Paso* is the best benchmark. The benefit recovered is comparable ($135 million there versus $162.5 million here). So are the hours supplied (1,500 hours there versus 1,630 here). The plaintiffs in *El Paso* similarly supplied technical expertise.

\*          \*          \*

After considering the *Raider* factors, policy interests, and precedent, I conclude that an incentive award of $500,000 is appropriate. This payment, on top of Elliott's pro rata recovery and the reimbursement of its expenses, will compensate it for the burdens it took on that are not shared with other class members. It will also

---

[78] Unlike individual plaintiffs in the precedent described above, Elliott approached the associated risks with the resources and leverage of a massive institution. Its exposure to risk is not comparable to the individual who puts her employment and personal reputation on the line to represent the class.

[79] Settlement Br. 45; Settlement Hr'g Tr. 41-42; *see also* Compl. ¶ 53.

reward Elliott for its extraordinary contributions to the case. The settlement would not exist without Elliott finding, litigating, and resolving the matter.

## III. CONCLUSION

Elliott is awarded an incentive fee of $500,000. The award will be paid from lead counsel's fee award. IT IS SO ORDERED.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

cc: Kimberly A. Evans, Esquire
Lindsay K. Faccenda, Esquire
Robert Erikson, Esquire